United States District Court
For the Northern District of California

1

2

3

4

5

6

7               IN THE UNITED STATES DISTRICT COURT

8             FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

LANCE JOHNSON, JOSEPHINE ANADOLA          No. C 09-01241 WHA
11 JOHNSON, and ARTHUR LEE,

12           Plaintiffs,

                                          **ORDER ON CROSS-MOTIONS**
13    v.                                  **FOR SUMMARY JUDGMENT**

14 COUNTY OF CONTRA COSTA, CITY OF
ANTIOCH, SHERIFF WARREN RUPF, in his
15 individual and official capacities, CONTRA
COSTA COUNTY SHERIFF SGT. J. MOULE
16 (DOE 1), CONTRA COSTA COUNTY
SHERIFF CORPORAL GARDNER (DOE 2),
17 CONTRA COSTA COUNTY SHERIFF
DETECTIVE WESTERMAN (DOE 3),
18 CONTRA COSTA COUNTY SHERIFF
DETECTIVE MARTINEZ (DOE 4),
19 CONTRA COSTA COUNTY SHERIFF
DETECTIVE GIBSON (DOE 5), CONTRA
20 COSTA COUNTY SHERIFF DETECTIVE
VORHAUER (DOE 6), ANTIOCH POLICE
21 DETECTIVE VINCELET (DOE 7),
ANTIOCH POLICE DETECTIVE
22 MORTIMER (DOE 8), ANTIOCH POLICE
DETECTIVE WISECARVER (DOE 9),
23 and DOES 10 through 100,

24           Defendants.
                                        /
25

26                    **INTRODUCTION**

27        In this Section 1983 action stemming from a March 2008 "drug bust" at plaintiffs' home in

28 Antioch, both sides move for partial summary judgment on whether the search warrant obtained

**United States District Court**
For the Northern District of California

1  and executed by defendants was invalid and, if so, whether qualified immunity shields defendants

2  from liability for obtaining and executing the search warrant.

3      As explained herein, it is undisputed that the search of plaintiffs' residence at 6 Winifred

4  Court did not uncover evidence of drug trafficking — it was, in fact, the residence at 5 Winifred

5  Court where such evidence was eventually discovered.  The undisputed record also shows that the

6  sealed affidavit relied upon by Contra Costa County Superior Court Judge John Kennedy to issue

7  the 6 Winifred Court search warrant did *not* contain sufficient facts to establish probable cause to

8  search plaintiffs' home.  Nevertheless, defendants contend that the search warrant issued by Judge

9  Kennedy for 6 Winifred Court was facially valid and that it was objectively reasonable for officers

10  to rely upon it when executing the search.  For this reason, defendants seeks summary judgment

11  that the officers who executed the 6 Winifred Court search warrant acted reasonably and are

12  entitled to qualified immunity.[1]  Additionally, defendants seek summary judgment that deputy

13  Brian Gardner — who prepared and submitted the search warrant application for 6 Winifred Court

14  — also acted with objective reasonableness and should be cloaked with qualified immunity.

15      For the reasons set forth below, this order agrees with defendants that the search warrant

16  issued for 6 Winifred Court was facially valid.  Plaintiffs' do not contend that the 6 Winifred Court

17  search warrant failed to particularly describe the place to be searched and the persons or things to

18  be seized, or that the warrant was unconstitutionally overbroad.  Rather, plaintiffs' attack is limited

19  solely to the sufficiency of the sealed affidavit that was considered by Judge Kennedy to issue the

20  6 Winifred Court search warrant.  Since this defect could not be gleaned from the face of the

21  search warrant, this order concludes — based on the undisputed record — that it was objectively

22  reasonable for defendant officers to rely upon its facial validity when executing the search of

23  plaintiffs' home.  Accordingly, defendants are entitled to qualified immunity for executing the 6

24  Winifred Court search warrant.

25

26

27      [1]  The instant motions deal solely with the validity of the 6 Winifred Court search
    warrant.  Plaintiffs have also brought Fourth Amendment claims of excessive force and

28  "knock and announce" violations against defendants.  These claims are *not* targeted by the
    instant motions due to factual disputes between the parties.  As such, all qualified immunity
    determinations herein are limited solely to claims surrounding the warrant's validity.

The question of whether defendant Gardner is entitled to qualified immunity for his conduct in *obtaining* the 6 Winifred Court search warrant presents closer question. As will be soon explained, this is not a straightforward situation where law enforcement mistakenly believed that probable cause existed to apply for a warrant. Rather, the instant case presents an unusual situation where it appears that law enforcement inadvertently submitted the *wrong* affidavit with the search warrant application. Due to this mix-up, defendant Gardner believed that the sealed affidavit faxed to and considered by Judge Kennedy contained various pieces of information that the affidavit, in fact, did not contain. This clerical error injects a mistake of *fact* into the qualified immunity inquiry. As discussed herein, whether qualified immunity can excuse such an error cannot, on this record, be resolved at summary judgment. There are genuine issues of material fact as to whether defendant Gardner's apparent clerical error was objectively reasonable under the circumstances, as well as whether his belief that probable cause existed was reasonable.

Finally, plaintiffs have not shown that they are entitled to summary judgment on their state claims for trespass, negligence, and violations of the California Bane Act. For these reasons, both motions for partial summary judgment are **GRANTED IN PART** and **DENIED IN PART**.

## STATEMENT

### 1.   OPERATION BROKEN WHEEL

In 2006, the federal government recruited the County of Contra Costa Sheriff's Office and other local law enforcement agencies to assist in a large-scale, multi-state investigation into the trafficking of illicit drugs from Mexico into the United States. The investigation — called "Operation Broken Wheel" — involved the surveillance of persons and vehicles believed to be involved in the transportation of drugs to distribution points across Contra Costa County. Contra Costa County deputies Moule, Gardner, Gibson, Vorhauer, and Martinez — all named as defendants in this action — were involved in the investigation (Moule Decl. ¶ 5; Gardner Decl. ¶ 5; Gibson Decl. ¶ 5; Vorhauer Decl. ¶ 5; Martinez Decl. ¶ 5).

### 2.   THE BLUE HONDA MINIVAN

In early March 2008, defendants were put on alert by the FBI that over 400 pounds of methamphetamine were being smuggled into the United States from Mexico. Large portions of

United States District Court
For the Northern District of California

the shipment were expected to be delivered to the San Francisco Bay Area.  Federal agents instructed defendants to conduct surveillance on any suspected trafficking vehicles but *not* to stop any vehicles or apprehend suspects unless further instructed.  Defendants were told, however, that if probable cause existed to seek search warrants for any of the persons or homes receiving illegal narcotics, then applications should be written and warrants obtained (Moule Decl. ¶ 7; Gardner Decl. ¶ 6; Gibson Decl. ¶ 6; Vorhauer Decl. ¶ 6; Martinez Decl. ¶ 6).

In the late afternoon on March 13, 2008, defendant and Contra Costa County deputy Brian Gardner spotted a known drug-trafficking vehicle — a blue Honda minivan — parked in the garage of a long-suspected "drug drop" residence.  The driver was also recognized by defendant Gardner as a suspected narcotics trafficker who had ties to the "Operation Broken Wheel" drug smuggling ring (Gardner Decl. ¶ 7).  Law enforcement officers — under the direction of defendant and Contra Costa County deputy Jeff Moule — surreptitiously followed the van as it made numerous stops at residences in the Bay Area, many of which had been previously identified as suspected narcotics drop-off points.  According to defendant Gardner, the vehicle's stop-and-go pattern was consistent with drug-trafficking activities (*id*. at ¶ 11).  The vehicle's first destination was a residence on Lynbrook Drive in Pittsburg (Snell Decl. Exh. E at CC48).

### 3.    WINIFRED COURT

After leaving Lynbook Drive and visiting a two other residences in the area, the blue Honda minivan's final drop-off point — before making a pit-stop at the "Broken Wheel Cocktail Lounge" — was a residence at the end of a short cul-de-sac in Antioch called Winifred Court (Moule Decl. ¶¶ 9–10).  Deputy Moule used his NexTel phone (which were carried by all investigating officers) to instruct one of the surveilling deputies — defendant Chris Martinez — to proceed on foot into Winifred Court and surveil the drop-off point (*id.* at ¶ 10; Martinez Decl. ¶ 9).  By the time deputy Martinez reached the end of the cul-de-sac, however, the van had already parked in a driveway between two residences:  5 and 6 Winifred Court.  Deputy Martinez did not see the driver of the van enter or leave either of the residences, and was "not 100 percent comfortable that the driver went into the residence at 6 Winifred Court, as opposed to the house next door"  (Martinez Decl. ¶ 9).  Deputy Martinez "believed," however, that the van was parked

4

1    in the driveway for 6 Winifred Court.  He also observed that the lights at 6 Winifred Court were on

2    while the neighboring residence — 5 Winifred Court — was unlit (*ibid.*).

3         **4.    THE TRAFFIC STOP**

4         When the blue Honda minivan left Winifred Court, a dark-colored Dodge Intrepid —

5    which had been parked next to the Honda — followed the minivan out of the neighborhood.

6    Deputy Martinez moved in on foot for a closer look at the Winifred Court residences.  He observed

7    that there were two adjacent driveways between 5 and 6 Winifred Court separated by a dirt strip.

8    Deputy Martinez then advised deputy Moule (using his own NexTel phone) that if law

9    enforcement officers could determine the address from which the Dodge Intrepid had left, he

10   believed he could determine the residence that the driver of the blue van had entered (*id.* at ¶ 10).

11        In response to this communication, Contra Costa County deputies Jason Vorhauer and Ian

12   Gibson (also defendants in this action) were instructed to follow the Dodge Intrepid and perform a

13   traffic stop of the vehicle if probable cause presented itself (Moule Decl. ¶ 10).  As directed,

14   deputies Vorhauer and Gibson followed the vehicle until it began exceeding the speed limit.  The

15   deputies then performed a traffic stop.  Upon questioning by the officers, both the driver and

16   passenger of the Dodge Intrepid told deputies Vorhauer and Gibson that they had departed from 6

17   Winifred Court and were en route to another address recognized by the officers as a suspected

18   drug-trafficking location (Gibson Decl. ¶¶ 8–9; Vorhauer Decl. ¶¶ 8–9).[2]  This information was

19   then relayed to other investigators on the "Operation Broken Wheel" team.

20        **5.    THE SEARCH WARRANTS**

21        While investigators tracked the activities of the blue Honda minivan, deputy Gardner went

22   to the Sheriff's Office substation in Pittsburg to begin drafting a comprehensive probable-cause

23   statement to support search warrant applications for the various drop-off points.  This process —

24   which occurred while the surveillance efforts unfolded — stretched from the evening of March 13

25   to the early morning hours of March 14 (Gardner Decl. ¶ 9).  Because "Operation Broken Wheel"

26   was a large-scale, multi-agency investigation, it was common for probable-cause statements

27

28        [2]  The details of the traffic stop, including whether the driver and passenger of the
     Dodge Intrepid could be reasonably relied upon as sources of information to establish
     probable cause, are disputed (P's Opp. 17–19).

United States District Court

For the Northern District of California

submitted in support of search warrant applications relating to the investigation to be filed under seal and kept confidential.  This ensured that sensitive information supporting the larger investigation would not be compromised (*id.* at ¶¶ 9–10).  For this reason, many passages in the probable-cause statement prepared by deputy Gardner during the evening in question were sealed.

As deputy Gardner drafted the probable-cause statement for the various drop-off points, he learned (while monitoring the officers' NexTel communications) that the blue Honda minivan had stopped at four different residences in the San Francisco Bay Area in a manner consistent with narcotics drops (*id.* at ¶ 11).  Deputy Gardner also heard that deputy Martinez, while surveilling Winifred Court on foot, was *not* able to initially ascertain which residence — 5 or 6 Winifred Court — the driver of the minivan had entered (*id.* at ¶ 12).  After hearing this information, deputy Gardner added a paragraph to the sealed probable-cause statement indicating that "it was undetermined which house on Winifred the suspect blue van driver had entered" (*ibid.*).

Sometime thereafter, however, deputy Gardner was apprised of the traffic stop performed by deputies Vorhauer and Gibson and the information provided by the vehicle's occupants regarding 6 Winifred Court.  Deputy Moule informed deputy Gardner that officer Martinez now believed that the driver of the blue Honda minivan had entered 6 Winifred Court based upon the way the minivan and the Dodge Intrepid were parked side-by-side in the driveways and the manner in which the two cars departed Winifred Court (*id.* at ¶ 13).[3]  The parties dispute what happened next.  According to deputy Gardner, he then revised the probable-cause statement he had been drafting to include the information about the traffic stop and deputy Martinez's belief that the minivan driver had entered 6 Winifred Court.[4]  While making these revisions, deputy Gardner testified that he deleted the paragraph he had typed earlier stating that the house in which the minivan driver had entered "was undetermined."  At that point, both deputies Gardner and Moule believed that probable cause to search 6 Winifred Court had been established (*id.* at ¶¶ 13–14).

[3]  Plaintiffs dispute deputy Martinez's "confirmation" that the minivan was parked at 6 Winifred Court, pointing to arguably contradictory evidence in the record that deputy Martinez was unsure where the minivan was physically parked (P's Opp. 18–19).

[4]  Plaintiffs dispute that these revisions were made at all by deputy Gardner, pointing to the fact that the search warrant application for 6 Winifred Court contained none of these alleged revisions (P's Opp. 14).

United States District Court

For the Northern District of California

After these revisions had been made, deputy Moule directed deputy Gardner to prepare and submit a search warrant application for the Lynbrook Drive residence (the blue minivan's first destination of the evening) (Gardner Dep. 148–49).  The application supposedly included an unsigned search warrant for the Lynbrook Drive residence, the revised probable-cause statement described above, and an affidavit signed by deputy Gardner that incorporated by reference the revised probable-cause statement.  Due to its sensitive contents, the probable-cause statement was filed under seal.  These materials were all faxed at 12:40 a.m. on March 14 to the on-duty magistrate, Contra Costa County Superior Court Judge John Kennedy.  Twenty minutes later, Judge Kennedy faxed the signed search warrant back to deputy Gardner.  Deputy Gardner and other defendant officers then executed the Lynbrook Drive search warrant at 1:47 a.m., recovering several pounds of methamphetamine and cocaine from the rafters of the residence's garage (Gardner Decl. ¶ 13; Moule Decl. ¶ 11).

Following the execution of the Lynbrook Drive search warrant, deputy Gardner returned to the Sheriff's Office substation to draft an addendum to the probable-cause statement he had already written.  The addendum stated that the search of the Lynbrook Drive residence had uncovered several pounds of narcotics, which made it more probable that searches of the remaining drop-off points would "lead to the discovery of additional drug quantities" (Snell Decl. Exh. E at CC38–39).  Deputy Gardner finished drafting this addendum at around 3:00 a.m. on March 14 (Gardner Decl. ¶ 14).  He then prepared a new search warrant application for the remaining three "drug drop" residences, including 6 Winifred Court.  The affidavit for the 6 Winifred Court search warrant application included by reference the earlier probable-cause statement deputy Gardner had submitted in support of the Lynbrook Drive search warrant application, as well as the addendum he had drafted thereto (*id.* at Exh. 3).  Deputy Gardner then faxed these materials to Judge Kennedy (*ibid.*; *id.* at Exh. 1–5).  According to deputy Gardner's deposition testimony, the comprehensive probable-cause statement that had already been submitted in support of the Lynbrook Drive search warrant was *not* re-faxed to Judge Kennedy, since the judge still had a copy of it (Gardner Dep. 146).  After these materials were faxed, deputy Gardner attests that he never saw the sealed probable-cause statement again until this litigation

7

began.  Because the statements were filed under seal, deputy Gardner stated in his declaration that they were either shredded at the substation or placed in a sealed envelope and mailed to the judge's chambers after being faxed (deputy Gardner does not recall which action he took but attests that one or the other occurred) (Gardner Decl. ¶¶ 10, 14).[5]

At 3:50 a.m., Judge Kennedy faxed the signed search warrant for 6 Winifred Court with the *unsealed* portion of the supporting affidavit back to deputy Gardner at the substation (*id.* at ¶ 15; Exhs. 1, 2).  On the face of the signed search warrant was a handwritten note by Judge Kennedy that stated:  "This proof includes the information contained in the affidavit in support of the search warrant for . . . Lynbrook Drive, Pittsburg, which is attached to and incorporated by reference in this search warrant" (*id.* at Exh. 1).  It is unclear, based upon the summary-judgment record, whether the *sealed* probable-cause statements were also faxed back to deputy Gardner by Judge Kennedy (*see* Gardner Dep. 144–46; P's Opp. 13–14).  In any event, according to deputies Gardner and Moule, the sealed probable-cause statements were *not* attached to the signed search warrant for 6 Winifred Court at the time officers executed the search (*id.* at ¶¶ 15–16; Moule Decl. ¶ 15).  Rather, given the confidential information in the probable-cause statement, only the *unsealed* portion of the supporting affidavit was attached to the 6 Winifred Court search warrant.[6]

While deputy Gardner stated under oath that he had revised the comprehensive probable-cause statement to include the information gleaned from the traffic stop (and defendant Martinez's subsequent confirmation of the 6 Winifred Court address), *the sealed probable-cause statement considered by Judge Kennedy to issue the 6 Winifred Court search warrant did not contain any of*

---

[5]  Plaintiffs dispute the assertion that defendant Gardner never saw the sealed probable-cause statement after it was faxed to Judge Kennedy.  Plaintiffs point to defendant Gardner's own deposition testimony, which appears to indicate that the sealed probable-cause statement was faxed back to him after being "initialed" by Judge Kennedy, and that deputy Gardner waited for "every page" of the search warrant application before leaving the Sheriff's Office substation (Gardner Dep. 145).

[6]  This fact is undisputed.  Plaintiffs provide no competent evidence showing that the sealed probable-cause statement was physically attached to the search warrant at the time it was executed.  Judge Kennedy's handwritten note on the face of the warrant does not create a genuine issue of fact.  The handwritten note was written by Judge Kennedy before the signed warrant was even faxed to deputy Gardner.  Judge Kennedy could not have known whether deputy Gardner, after receiving the faxed materials, physically attached the probable-cause statement to the search warrant.  The undisputed evidence shows that it was not attached.

United States District Court

For the Northern District of California

*United States District Court*
*For the Northern District of California*

*these revisions*.  Instead, the undisputed record shows that the only statement pertaining to Winifred Court in the search warrant application considered by Judge Kennedy was the following paragraph (Gardner Decl. Exh. 4 at CC49) (emphasis added):

> The van was followed to Winifred Ct. in Antioch.  The van parked on the street and the driver exited.  *It was undetermined which residence the driver of the van went into*.  The van departed Winifred Ct. at approximately 30 minutes later.

None of the officers who executed the search of plaintiffs' residence — including deputy Gardner — knew that the sealed probable-cause statement relied upon by Judge Kennedy lacked any of the information supposedly establishing probable cause to search 6 Winifred Court.

### 6.   THE SEARCH OF 6 WINIFRED COURT

At approximately 4:38 a.m. on March 14, deputies Moule and Gardner, along with other Contra Costa County officers and federal law enforcement personnel, executed the search warrant for 6 Winifred Court (Gardner Dep. 20–23, 83–84; Moule Dep. 53; Severe Dep. 21).  While many details surrounding the manner in which the search warrant was executed are disputed, both sides agree that the search failed to uncover the "large quantifies of drugs" expected by investigators. Instead, the only contraband recovered was a small plastic baggie containing residue of an ecstacy tablet, which plaintiff Arthur Lee (the son of plaintiffs Lance and Josephine Johnson) voluntarily told investigators was in his pants pocket (Severe Dep. 44–48).  Following the search, the district attorney declined to press charges against any of the plaintiffs (Snell Decl. Exh. E at CC25–26).

### 7.   THE SEARCH OF 5 WINIFRED COURT

Two days later, "Operation Broken Wheel" investigators received a fresh tip that the driver of the blue Honda minivan would be transporting large sums of United States currency down to his contacts in Los Angeles.  Surveillance was again conducted on the minivan as it made numerous stops at various residences, including — once again — the cul-de-sac at Winifred Court.  This time, however, investigators clearly observed the driver pulling into the driveway for 5 Winifred Court (*id.* at Exh. E at CC53).  After obtaining a search warrant for 5 Winifred Court, investigators searched the property and uncovered two pounds of methamphetamine and "pay-owe" sheets evidencing drug-trafficking activity (*id.* at Exh. N).

\*            \*            \*

**United States District Court**
For the Northern District of California

1    This action was filed on March 23, 2009.  The complaint alleged the ten claims for

2  monetary damages against eleven individual and municipal defendants: (1) violations of 42 U.S.C.

3  1983 by the individual defendants; (2) supervisor liability for violations of 42 U.S.C. 1983 by

4  defendant Moule; (3) *Monell* violations against Contra Costa County and the City of Antioch; (4)

5  trespass; (5) false arrest; (6) assault; (7) battery; (8) intentional infliction of emotional distress; (9)

6  negligence; and (10) violations of California Civil Code Sections 52 and 52.1 (also called the

7  California Bane Act) (Dkt. No. 1).

8    As stated, the parties agree that too many factual disputes surround plaintiffs' claims of

9  excessive force and "knock and announce" violations.  Accordingly, their cross-motion encompass

10  only the validity of the search warrant obtained for and executed at 6 Winifred Court.

11  Specifically, plaintiffs' seek partial summary judgment against defendant Gardner on their first,

12  fourth, ninth, and tenth claims for relief, against defendant Moule on their first, second, fourth,

13  ninth, and tenth claims for relief, and against defendant County of Contra Costa on their fourth,

14  ninth, and tenth claims for relief.  Defendants, by contrast, seek summary judgment that defendants

15  Moule, Gardner, Martinez, Gibson, and Vorhauer are all entitled to qualified immunity in

16  connection with obtaining and executing the 6 Winifred Court search warrant, and that defendant

17  Moule cannot be held liable under any theory of "supervisor liability."[7]  Defendants did *not* move

18  for summary judgment on any of the state claims asserted by plaintiffs.

19                                              **ANALYSIS**

20    Summary judgment is proper when the "pleadings, depositions, answers to interrogatories,

21  and admissions on file, together with the affidavits, show that there is no genuine issue as to any

22  material fact and that the moving party is entitled to judgment as a matter of law."  FRCP 56(c).

23  An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the

24  non-moving party, and "material" only if the fact may affect the outcome of the case.  *Anderson v.*

25  *Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  All reasonable inferences, however, must be

26  drawn in the light most favorable to the non-moving party.  *Olsen v. Idaho State Bd. of Med.*, 363

27

28      [7]  During the briefing of these cross-motions, the parties filed a stipulated dismissal of
defendants Rupf and Westerman (Dkt. No. 53).  Accordingly, this order will not address any
arguments directed at these former defendants.

F.3d 916, 922 (9th Cir. 2004).  That said, unsupported conjecture or conclusory statements cannot

defeat summary judgment.  *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008).

### 1.   PLAINTIFFS' SECTION 1983 CLAIMS

As stated, with respect to plaintiffs' Section 1983 claims, the instant motions encompass

only the validity of the search warrant obtained for and executed at 6 Winifred Court.  Plaintiffs'

excessive force and "knock and announce" claims — also brought under Section 1983 — are *not*

addressed or affected by this order.  With respect to the 6 Winifred Court search warrant, it is well-

established that an illegal search in violation of the Fourth and Fourteenth Amendments is

actionable under 42 U.S.C. 1983.  Here, both sides ask the Court to determine whether defendant

officers — based upon the undisputed record facts — have violated the Fourth Amendment

warrant requirement and, if so, are entitled to qualified immunity for their actions.

A search based upon a proper search warrant issued by a neutral and detached magistrate

and supported by probable cause satisfies the Fourth Amendment.  A proper search warrant is one

that "particularly describ[es] the place to be searched, and the persons or things to be seized."  U.S.

Const. amend IV.  To establish probable cause, there must be "a fair probability that contraband or

evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238

(1983).  The determination of probable cause, however, must be made by a neutral and detached

magistrate in order "to insure that the deliberate, impartial judgment of a judicial officer will be

interposed between the citizen and the police, to assess the weight and credibility of the

information which the complaining officer adduces as probable cause."  *Wong Sun v. United

States*, 371 U.S. 471, 481–82 (1963).  Moreover, probable cause must be "supported by Oath or

affirmation."  U.S. Const. amend IV.  As such, "[a]ll data necessary to show probable cause for the

issuance of a search warrant must be contained within the four corners of a written affidavit given

under oath."  *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006) (en banc) (citation

omitted).

Even if a violation of the Fourth and Fourteenth Amendments is found, however,

government officials may be shielded from liability under the doctrine of qualified immunity —

provided that "they act reasonably under the circumstances."  *KRL v. Estate of Moore*, 512 F.3d

United States District Court

For the Northern District of California

1184, 1189 (9th Cir. 2008) (citation omitted).  A government official does not act reasonably under the circumstances if his conduct violated a constitutional right and that right was clearly established at the time of the alleged violation.  *Ibid.* (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)).  In other words, if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted[,]" he is not entitled to qualified immunity.  *Saucier*, 533 U.S. at 202.

### A.    The Fourth Amendment Warrant Requirement was Violated

When evaluating whether qualified immunity should apply to a government official, a district court need not determine whether a constitutional right has been violated before addressing whether the right was clearly established.  The court may proceed in any order.  *Pearson v. Callahan*, --- U.S. ----, 129 S. Ct. 808, 815 (2009).  Here, the constitutional violation is easily addressed first.  The Fourth Amendment states unambiguously that "no Warrants shall issue, but upon probable cause, *supported by Oath or affirmation*, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV (emphasis added).  There is no dispute that the sworn affidavit and probable-cause statement considered by Judge Kennedy to issue the search warrant for 6 Winifred Court merely stated (Gardner Decl. Exh. 4 at CC49) (emphasis added):

> The van was followed to Winifred Ct. in Antioch.  The van parked on the street and the driver exited.  *It was undetermined which residence the driver of the van went into.*

No other sworn information regarding Winifred Court was provided to or considered by Judge Kennedy to issue the search warrant.

It is obvious, therefore, that the affidavit considered by Judge Kennedy to issue the 6 Winifred Court search warrant contained no facts or circumstances showing "a fair probability that contraband or evidence of a crime will be found" at plaintiffs' residence.  This defect rendered the search warrant for 6 Winifred Court invalid.  *Nathanson v. United States*, 290 U.S. 41, 47 (1933). Since defendants do not argue that any exceptions to the Fourth Amendment warrant requirement, such as exigent circumstances, apply to the search of 6 Winifred Court, the undisputed facts

12

demonstrate that plaintiffs' constitutional rights have been violated.[8]  *See Millender v. County of Los Angeles*, --- F.3d ----, 2010 WL 3307491, at *5 (9th Cir. 2010) ("The Supreme Court has recognized that a search or seizure pursuant to an invalid warrant constitutes an invasion of the constitutional rights of the subject of that search 'at the time of [the] unreasonable governmental intrusion.'") (citation omitted).

### B.  All Officers Except Defendant Gardner are Entitled to Qualified Immunity for Violating the Warrant Requirement of the Fourth Amendment

Qualified immunity is meant to balance two important interests:  the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 129 S. Ct. at 815 (citations omitted).  Here, this order must address two separate inquiries: (1) whether qualified immunity applies to defendant Gardner, who submitted the application for the invalid 6 Winifred Court search warrant, and (2) whether qualified immunity applies to the remaining defendants who relied upon and executed the invalid 6 Winifred Court search warrant.

### i.  Whether Defendant Gardner is Entitled to Qualified Immunity Cannot be Decided at Summary Judgment

"Law enforcement officers are entitled to qualified immunity if they act reasonably under the circumstances, even if the actions result in a constitutional violation." *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1027 (9th Cir. 2002).  As the Supreme Court emphasized in *Pearson v. Callahan*, this rule applies to constitutional violations resulting from mistakes of law as well as mistakes of fact.  Properly characterizing an officer's error as one or the other is not always a straightforward task.  *See Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (criticizing the majority opinion as improperly construing the officer's error as a mistake of law rather than a mistake of fact).

---

[8]  While the declarations of defendants Moule and Gardner state that "exigent circumstances" were present during the evening in question, defendants did *not* raise this argument in any of their briefs.

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

In their motion for partial summary judgment, plaintiffs treat the invalid search warrant for 6 Winifred Court as being the product of an unreasonable mistake of *law*. According to plaintiffs, defendant Gardner's entitlement to qualified immunity for obtaining the 6 Winifred Court search warrant must be approached with the same "objective reasonableness" standard that applies to the "good faith" exception in Fourth Amendment suppression motions. This is true. This rule was made clear in *Malley v. Briggs*, where the Supreme Court explained that "the same standard of objective reasonableness [that] applied in the context of a suppression hearing . . . defines the qualified immunity accorded an officer whose request for a warrant caused an unconstitutional arrest." *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986) (citing *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)); *see also Johnson v. Walton*, 558 F.3d 1106, 1111 (9th Cir. 2009) (applying *Malley* and *Leon* to unconstitutional searches). The *Malley* decision further explained that to determine whether qualified immunity applies to an officer who applies for a search warrant without sufficient probable cause, a court must ask "whether a reasonably well-trained officer in [the defendant's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley*, 475 U.S. at 345.

*Malley v. Briggs*, however, did not involve the same type of error that occurred here. In the instant case, the constitutional violation resulted from what appears to be an inadvertent clerical error in the search warrant application process.[9] Defendant Gardner — who prepared the 6 Winifred Court search warrant application and was the affiant for the supporting affidavit and sworn probable-cause statement — stated in his declaration and during his deposition that he believed that probable cause existed to search plaintiffs' residence based upon, among other things, information gleaned from the traffic stop performed by deputies Vorhauer and Gibson. He further believed that the sworn probable-cause statement submitted to and considered by Judge Kennedy to issue the 6 Winifred Court search warrant contained these specific facts. As the

---

[9] Given that plaintiffs seek summary judgment that defendant Gardner is *not* entitled to qualified immunity, this is based upon a view of the record in a light most favorable to defendant Gardner. As stated, plaintiffs dispute whether defendant Gardner even revised the probable-cause statement (P's Opp. 14). If he did not, then it is obvious that no "clerical error" can be blamed for the defective affidavit.

14

summary-judgment record indicates, however, the probable-cause statement relied upon by Judge Kennedy did *not* contain any of these facts.

This is not the same type of "mistake in judgment" that occurred in *Malley v. Briggs*.  In *Malley v. Briggs*, there was no question that the affidavit submitted to and relied upon by the magistrate was exactly what the accused officer had intended to submit.  *See* 475 U.S. at 338–39.  Similarly, in *Johnson v. Walton*, a recent Ninth Circuit decision, the law enforcement officer who applied for the search warrant set forth her entire basis for probable cause in the affidavits supporting the search warrant application.  There was no inadvertent "mix-up" in what she believed she had submitted to the magistrate and what the magistrate actually considered.  *See* 558 F.3d at 1109–11.  In sum, those decisions focused squarely on whether the accused officers had made reasonable mistakes of *law — e.g.*, whether the accused officers held an objectively reasonable belief that probable cause, as set forth in their search warrant applications, existed to search the targeted premises.

The difficulty presented in the instant case is that, in addition to there being a dispute surrounding whether defendant Gardner reasonably believed that probable cause existed to search plaintiffs' residence, it also involves a clear mistake of *fact* — defendant Gardner believed that he had faxed Judge Kennedy a "revised" sworn statement establishing probable cause to search plaintiffs' residence, and did not learn until well after this litigation began that this belief was mistaken.  Since it is well-established that qualified immunity extends equally to reasonable mistakes of law and fact, the reasonableness of this *factual* error must also be considered in determining whether defendant Gardner should be held personally liable for obtaining the 6 Winifred Court search warrant.

These questions cannot be resolved at summary judgment.  As referenced earlier in this order, there are numerous factual disputes with respect to defendant Gardner's conduct in preparing the "revised" probable-cause statement to conclude whether it was reasonable for him to fail to recognize that the "wrong" probable-cause statement had been submitted to Judge Kennedy.  Indeed, plaintiffs dispute that it was even written.  Additionally, the parties dispute various material facts surrounding whether defendant Gardner's belief that probable cause existed to

search 6 Winifred Court was reasonable.  For these reasons, both motions for summary judgment

on whether defendant Gardner is entitled to qualified immunity must be **DENIED**.

None of plaintiffs' arguments supporting their motion warrants a different conclusion.

Plaintiffs rely heavily on two Ninth Circuit decisions — *United States v. Luong* and *United States*

*v. Hove* — as justifying the unavailability of qualified immunity.  This reliance is misplaced.  Both

*Luong* and *Hove* involved suppression hearings rather than Section 1983 claims.  In *Luong*, the

Ninth Circuit declined to consider unsworn oral communications between law enforcement and the

magistrate who issued the search warrant to determine whether the "good faith" exception to the

exclusionary rule applied.  Rather, in finding that the officer's affidavit failed to establish at least a

colorable argument for probable cause, the court emphasized that "[a]ll data necessary to show

probable cause for the issuance of a search warrant must be contained within the four corners of a

written affidavit given under oath."  *United States v. Luong*, 470 F.3d 898, 904 (9th Cir. 2006)

(citation omitted).  In *Hove*, the Ninth Circuit similarly held that the "good faith" exception to the

exclusionary rule could not extend to facts outside the four corners of a written affidavit.  Despite

acknowledging that clerical errors may have contributed to the deficiency of the search warrant

affidavit in question, the court declined to look beyond the information in the affidavit to save the

evidence from suppression.  *United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir. 1988).

Neither *Luong* nor *Hove*, however, addressed whether an officer's reasonable mistake of

*fact* in the warrant application process could form the basis for qualified immunity, even if the

mistake rendered the search warrant application "so lacking in indicia of probable cause as to

render official belief in its existence unreasonable."  Indeed, to blindly apply the rule set forth in

*Luong* and *Hove* to the instant case would all but eliminate qualified immunity for reasonable

mistakes of fact in the warrant application process.[10]

---

[10] Even the majority opinion in *Groh v. Ramirez* acknowledged the continuing
importance of extending qualified immunity to reasonable mistakes of fact.  In *Groh*, the
Court concluded that the search warrant in question was so facially defective that — *even if a
clerical error was to blame for the defect* — no reasonable officer who took the time to
glance at the face of the warrant could believe that it was valid.  The Court emphasized,
however, that it was not according "the correctness of paper forms" a higher status than
"substantive rights."  Rather, the Court recognized that "officers in the dangerous and
difficult process of making arrests and executing search warrants" are entitled to "some

**United States District Court**
For the Northern District of California

As the Supreme Court explained in *Malley v. Briggs*, the test for qualified immunity is "whether a reasonably well-trained officer in [defendant's] position would have known that his affidavit failed to establish probable cause *and that he should not have applied for the warrant*." *Malley*, 475 U.S. at 345 (emphasis added).  Arguably, a reasonably well-trained officer in deputy Gardner's position, knowing what deputy Gardner knew and facing the same time-pressures that he was facing, would have applied for the 6 Winifred Court search warrant and would *not* have been aware that the affidavit submitted to Judge Kennedy did not include the "revised" probable-cause statement.  Because of the facts surrounding these questions are disputed, a jury will have to decide whether defendant Gardner's mistaken belief that he had submitted the "revised" probable-cause statement to Judge Kennedy was a reasonable belief, and whether defendant Gardner's belief that probable cause existed was objectively reasonable.

### ii. All Remaining Defendants are Entitled to Qualified Immunity for the Execution of the Search Warrant

With respect to the *execution* of an invalid search warrant, the same "objective reasonableness" standard discussed above applies to whether officers are entitled to qualified immunity.  Here, numerous officers stand accused under Section 1983 of violating the Fourth Amendment warrant requirement by executing the invalid search warrant for 6 Winifred Court.

To determine whether qualified immunity applies to these officers, the critical question is whether the search warrant issued for 6 Winifred Court — despite being invalid for the reasons set forth herein — was nonetheless *facially* valid.  The importance of this inquiry was emphasized by the Supreme Court in *Groh v. Ramirez*.  In *Groh*, the Court held that qualified immunity does not apply when a search warrant is "so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid."  540 U.S. at 565, 579 (citing *Leon*, 468 U.S. at 923).  Unlike the instant case, however, the focus in *Groh* was not on whether the search warrant was supported by probable cause, but on whether the search warrant was so facially overbroad in describing the places to be

latitude" in the process.  *See Groh*, 540 U.S. at 565 n.9 (responding to Justice Kennedy's dissent regarding the need to excuse reasonable clerical errors).  As will be soon explained, the search warrant in the instant case was *not* facially invalid.  Given this fact, the reasonableness of defendant Gardner's mistake of fact must be given due consideration.

17

**United States District Court**
For the Northern District of California

searched and the persons or things to be seized that "[e]ven a cursory reading of the warrant . . . would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Id.* at 564; *see also id.* at 565 n.9 (commenting that the substantive rights guaranteed by the Fourth Amendment are not protected "when [an] officer fails to take the time to glance at the authorizing document and detect a glaring defect . . . of constitutional magnitude.").

Here, plaintiffs do not contend that the Winifred Court search warrant failed to describe the places to be searched and the persons or things to be seized with sufficient particularity.  Rather, plaintiffs' sole contention is that the defects in the sealed probable-cause statement submitted by deputy Gardner to Judge Kennedy were so glaring in magnitude that the search warrant must be deemed *facially* invalid.  This order disagrees.

Contrary to plaintiffs' arguments, defects that may have been present in a search warrant application have no bearing on whether a search warrant is valid on its face.  Rather, facial validity is measured only by information that *must* be present on the face of a constitutionally sufficient search warrant, such as a particularized description of the place to be searched and the persons or things to be seized.  *See id.* at 565, 579; *see also Luong*, 470 F.3d at 902 (describing the facial invalidity of a search warrant as where "*i.e.*, it fails to specify the place to be searched or the things to be seized").  In the instant case, the constitutional defects targeted by plaintiffs were present in a *sealed* probable-cause statement filed in support of the 6 Winifred Court search warrant application.  A "cursory reading" of the 6 Winifred Court search warrant and unsealed affidavit attached thereto would not have revealed this defect.  In other words, the search warrant itself it did not contain any "glaring deficiencies" of "constitutional magnitude."  Moreover, it is well-established that the Fourth Amendment does *not* require a search warrant to set forth the magistrate's basis for finding probable cause.  *See United States v. Grubbs*, 547 U.S. 90, 98 (2006).  As such, defendant officers could not have been reasonably expected to question whether the sealed affidavit submitted in support of the search warrant application for 6 Winifred Court contained sufficient facts to establish probable cause.  This, of course, is exactly why "inadequate probable cause does not necessarily render a warrant facially invalid nor prevent reasonable belief

United States District Court

For the Northern District of California

in the existence of probable cause." *Ortiz v. Van Auken,* 887 F.2d 1366, 1371 (9th Cir. 1989).  For these reasons, this order concludes — based upon the undisputed record — that the search warrant issued by Judge Kennedy was facially valid, and defendants' motion for partial summary judgment on the facial validity of the search warrant is **GRANTED**.

Given the facial validity of the search warrant for 6 Winifred Court, the officers who executed the search warrant cannot be stripped of qualified immunity if their reliance on the warrant was objectively reasonable.  *Marks v. Clarke*, 102 F.3d 1012, 1028 (9th Cir. 1996) (citing *Leon*, 468 U.S. at 920–21).  Here, the officers who executed the search warrant at 6 Winifred Court had in their hands a facially valid search warrant issued by a neutral and detached magistrate.  Given that these defendants — with the exception of deputy Gardner — did not participate in drafting or filing the search warrant application, a reasonably well-trained officer in their position would not have known that the sealed probable-cause statement relied upon by Judge Kennedy was defective.  As such, they cannot be said to have acted with objective unreasonableness in relying upon the facially valid search warrant for 6 Winifred Court.  There being no genuine issues of material fact on this issue, qualified immunity shields all defendants (except defendant Gardner) from liability for the execution of the invalid 6 Winifred Court search warrant.  *See Ortiz*, 887 F.2d at 1371.  Defendants motion for summary judgment that qualified immunity bars liability for all defendants except defendant Gardner is **GRANTED**.  Plaintiffs' motion for summary judgment that defendant Moule is liable for violating the Fourth Amendment warrant requirement is **DENIED**.

The decisions cited by plaintiffs harm rather than support their argument.  For example, in *KRL v. Estate of Moore*, the Ninth Circuit explained, "[e]ven if a warrant is so lacking in probable cause that official reliance is unreasonable, not all officers executing the search are liable for the constitutional deficiency."  *KRL*, 512 F.3d at 1190.  This is because "officers' roles can vary widely" and "[w]hat's reasonable for a particular officer depends on his role in the search."  *Ibid.* (citing *Butte-Silver Bow*, 298 F.3d at 1027).  Thus, "officers who plan and lead a search 'must actually read the warrant and satisfy themselves that . . . it is not defective in some obvious way'"

19

1  while line officers "may accept the word of their superiors that they have a warrant and that it is

2  valid." *Ibid.* (citing *Leon* and *Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986)).

3      In the instant case, even those officers who planned and led the search of plaintiffs'

4  residence — such as defendant Moule — would not have discovered the constitutional defect by

5  reading the 6 Winifred Court search warrant.  As explained above, it was facially valid and "not

6  defective in some obvious way."  Moreover, it is undisputed that two defendants — deputies

7  Gibson and Vorhauer — functioned as line officers during the Winifred Court search (Gibson

8  Decl. ¶ 12; Vorhauer Decl. ¶ 11).  Accordingly, the *KRL* decision supports the conclusion reached

9  herein that all defendant officers — with the exception of defendant Gardner — are entitled to

10  qualified immunity as a matter of law for relying on the facial validity of the search warrant.[11]

11      It must be emphasized, however, that this immunity is limited to the specific claims

12  addressed by the instant motions.  Both sides acknowledge that there are factual disputes

13  surrounding the *manner* in which the search warrant was executed by defendants — namely,

14  whether defendants used excessive force or failed to "knock and announce" prior to the search.

15  While this order may hold that qualified immunity applies to particular defendants with respect to

16  executing the invalid search warrant, it remains to be seen whether qualified immunity will shield

17  these defendants from plaintiffs' remaining claims.

18      **C.    Supervisory Liability Under Section 1983**

19      Plaintiffs also seek to hold defendant Moule liable under Section 1983 on a theory of

20  supervisory liability.  According to plaintiffs, defendant Moule — as the "supervisor" of the

21  investigation — should be held personally liable for failing to prevent the violation of the Fourth

22  Amendment warrant requirement that occurred.  This order disagrees.

23      Supervisors can only be held liable under Section 1983 for the actions of their subordinates

24  for their own culpable action or inaction in the training, supervision, or control of subordinates, for

25  their acquiescence in the constitutional deprivation of which a complaint is made, or for conduct

26  that showed a reckless or callous indifference to the rights of others.  *See Cunningham v. Gates,*

27

28      [11]  It is also telling that plaintiffs did not oppose defendants' summary judgment
    motion that qualified immunity cloaks defendants Gibson, Vorhauer, and Martinez with
    respect to the execution of the search warrant for 6 Winifred Court (*see* P's Opp. 19–22).

United States District Court

For the Northern District of California

229 F.3d 1271, 1292 (9th Cir. 2000). For liability to exist, the supervisor must have been personally involved in the constitutional deprivation or a sufficient causal connection must exist between the supervisor's unlawful conduct and the constitutional violation. *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001). There is no "vicarious liability" under Section 1983. *See Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1948 (2009).

As the undisputed facts illustrate, defendant Moule's involvement in obtaining the Winifred Court search warrant was limited to communicating surveillance information to establish probable cause to deputy Gardner, who was preparing the probable-cause statements and search-warrant applications. It was objectively reasonable for deputy Moule to believe that defendant Gardner — after being informed of all of the facts and circumstances surrounding the traffic stop of the Dodge Intrepid and deputy Martinez's "confirmation" of the 6 Winifred Court address — would include this information in the search-warrant application for plaintiffs' residence. Deputy Moule cannot be held liable for an inadvertent clerical error committed by a subordinate, even if he was "in charge of the search warrant," was "defendant Gardner's supervisor," and "was the person who made the decision that there was sufficient probable cause to present the request for a search warrant to a judge." This does not amount to "culpable conduct" warranting the imposition of personal liability upon a supervisor.

Plaintiffs' reliance upon *Butte-Silver Bow* to support their theory of supervisor liability is misplaced. The *Butte-Silver Bow* decision set forth the unremarkable proposition that officers who plan and lead a search (unlike line officers who merely assist in its execution) "must actually read the warrant and satisfy themselves that . . . it is not defective in some obvious way." 298 F.3d at 1027. In other words, such officers cannot escape *direct* liability under Section 1983 by blindly relying upon a facially invalid search warrant (the *Butte-Silver Bow* decision was affirmed by the Supreme Court in *Groh v. Ramirez*, which stood for exactly the same proposition).

As explained above, unlike the search warrant in *Butte-Silver Bow*, the Winifred Court search warrant was facially valid. As such, nothing in that decision supports plaintiffs' argument that defendant Moule should be held liable — either directly or as a supervisor — for the clerical error that rendered the search warrant invalid. Plaintiffs' motion for summary judgment against

1    defendant Moule under a theory of supervisory liability is therefore **DENIED**.  Defendants' motion

2    for summary judgment that defendant Moule cannot be held liable as a supervisor is **GRANTED**.

3         **2.    PLAINTIFFS' STATE CLAIMS**

4         Plaintiffs also move for partial summary judgment on their fourth, ninth, and tenth claims

5    against defendants — namely, that defendants committed trespass, negligence, and violated the

6    California Bane Act.  In their opposition, defendants put forth a myriad of arguments, including:

7    (1) plaintiffs failed to comply with the California Government Tort Claims Act, Cal. Gov. Code,

8    §§ 900 *et seq*., (2) plaintiffs' trespass claim fails as a matter of law, (3) plaintiffs' negligence claim

9    fails as a matter of law, (4) plaintiffs' California Bane Act claim fails as a matter of law, (5) the

10   County of Contra Costa cannot be held directly liable on any state claim, and (6) immunity under

11   state law shields all defendants from these claims.[12]  There arguments will be addressed in turn.

12         **A.    The California Government Tort Claims Act**

13        Under the California Government Tort Claims Act, before filing a suit for monetary

14   damages against a public entity or government official, a claimant must submit a written claim to

15   the corresponding city agency within six months after accrual of the claim.  Cal. Gov. Code §§

16   911.2, 945.4; *State of California v. Superior Court (Bodde)*, 32 Cal.4th 1234, 1239 (2004).  The

17   city agency must then accept or reject the claim within 45 days.  Cal. Gov. Code § 912.4.  As the

18   California Supreme Court explained, the purpose of the Tort Claims Act is "to provide the public

19   entity sufficient information to enable it to adequately investigate claims and settle them, if

20   appropriate, without the expense of litigation."  *City of San Jose v. Superior Court*, 12 Cal.3d 447,

21   455 (1974).  As such, a written claim need not contain the detail and specificity required of a

22   pleading, but need only "fairly describe what [the] entity is alleged to have done."  *Stockett v.*

23   *Assoc. of California Water Agencies Joint Powers Ins. Authority*, 34 Cal.4th 441, 446 (2004)

24   (citation omitted).

25        Defendants argue that plaintiffs failed to abide by the California Government Tort Claims

26   Act by providing insufficient information regarding their claims for negligence (claim nine) and

27   for violations of the California Bane Act (claim ten).  This order disagrees.  The written claims

28

---

[12]  Defendants did *not* move for summary judgment on these state claims.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  submitted by all three plaintiffs to the County of Contra Costa provided sufficient notice of the

2  claims asserted herein to enable the County to adequately investigate the claims and settle them, if

3  appropriate (Holmes Decl. Exhs. 6–8).  Specifically, the claims properly set forth the date and time

4  that the search warrant was executed, alleged that the entry was "unlawful," alleged that plaintiffs

5  Arthur Lee and Josephine Johnson suffered "negligent infliction of emotional distress" as a result

6  of the search, and alleged that plaintiff Lance Johnson was "physically assaulted" and "falsely

7  imprisoned" (*ibid.*).  This is sufficient to provide adequate notice under the California Government

8  Tort Claims Act for each of the state claims alleged herein.

9         **B.     Plaintiffs' Trespass Claim**

10        Plaintiffs' seek summary judgment on their fourth claim for trespass.  Under California

11  law, a plaintiff must prove: (1) the plaintiff's ownership or control of the property, (2) the

12  defendant's intentional, reckless, or negligent entry on the property, (3) lack of permission to enter

13  the property, or acts in excess of the permission, (4) actual harm, and (5) the defendant's conduct

14  as a substantial factor in causing the harm.  *Ralphs Grocery Co. v. United Food and Commercial*

15  *Workers Union Local 8*, 113 Cal.Rptr.3d 88, 93 (2010).  The entry on the property, however, must

16  be *unauthorized* for trespass liability to be found.  *Church of Christ in Hollywood v. Superior*

17  *Court*, 99 Cal. App. 4th 1244, 1252 (2002)**.**

18        Plaintiffs do not provide particularly compelling arguments in support of their trespass

19  claim.  Specifically, plaintiffs' motion and reply brief both presume that the 6 Winifred Court

20  search warrant was facially invalid, and therefore the entry by defendant officers was plainly

21  unauthorized.  As explained herein, the 6 Winifred Court search warrant was facially *valid*.

22  Defendants, on the other hand, argue that the entry by defendants into plaintiffs' residence was at

23  least impliedly authorized, given the facial validity of the 6 Winifred Court search warrant.

24  Neither side cites any case law addressing whether an invalid search warrant that is valid on its

25  face constitutes "authorization" as a matter of law under California trespass law.

26        Defendants also point to various sections of the California Government Code as

27  immunizing the conduct of defendant officers.  For plaintiffs' trespass claim, defendants

28  specifically point to Section 821.8, which sets forth the following grounds for immunity:

United States District Court

For the Northern District of California

1

2

3

> A public employee is not liable for an injury arising out of his entry upon any property where such entry is expressly or impliedly authorized by law.  Nothing in this section exonerates a public employee from liability for an injury proximately caused by his own negligent or wrongful act or omission.

4

Defendants also point to Section 821.6, which states (emphasis added):

5

6

> A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, *even if he acts maliciously and without probable cause.*

7

8

Giving full consideration to the arguments presented by both sides, this order concludes that summary judgment on plaintiffs' trespass claim cannot be granted.  *First*, there is at least a genuine issue of material fact as to whether defendants entry into plaintiffs' residence based upon the facially valid warrant was "unauthorized."  *Second*, defendants have put forth a strong argument that Section 821.8 may serve as a bar to plaintiffs' claim for trespass because defendant officers reasonably relied upon the facial validity of the Winifred Court search warrant when entering plaintiffs' residence.  *See Ogborn v. City of Lancaster*, 101 Cal. App. 4th 448, 462 (2002) (granting immunity to officers under Section 821.8 when the warrant in question "clearly authorized entry onto the Property and into the structures located there").

9

10

11

12

13

14

15

16

17

Defendants' strongest argument, however, is their claim of immunity under Section 821.6. As the Ninth Circuit recently explained in *Blankenhorn v. City of Orange*, while the "principal function" of Section 821.6 was to provide relief from malicious prosecution, the statute also "extends to actions taken in preparation for formal proceedings," including actions "incidental to the investigation of crimes."  485 F.3d 463, 487–88 (9th Cir. 2007) (citations omitted).  While the *Blankenhorn* decision ultimately held that Section 821.6 did not apply to tort claims arising from the *arrest* of a suspect, this was only because the Ninth Circuit recognized that "section 821.6, as it applies to police conduct, is limited to actions taken in the course or as a consequence of an investigation."  *Ibid.* (concluding that an arrest is *not* an action taken pursuant to an investigation). This immunity extends to "claims made by those who are not the actual targets of the investigation of the prosecution, but who happen to be injured by decisions an officer makes during the course of such investigation."  *Amylou R. v. County of Riverside*, 28 Cal. App. 4th 1205, 1213–14 (1994).

18

19

20

21

22

23

24

25

26

27

28

24

United States District Court

For the Northern District of California

1    Here, the search of defendants' home was undoubtedly an action "incidental to the

2 investigation of crimes" — namely, "Operation Broken Wheel," a multi-jurisdictional narcotics

3 investigation that led to the grand-jury indictment of two individuals, including the driver of the

4 blue Honda minivan (Gardner Decl. ¶ 7; Dkt. No. 46, Exh. A).[13] Indeed, in *Baughman v. State of*

5 *California*, defendant police officers accused of negligently destroying computer disks while

6 investigating a crime pursuant to a search warrant were held immune under Section 821.6 for

7 plaintiffs' property loss. *Baughman v. State of California,* 38 Cal. App. 4th 182, 192–93 (1995).

8 As the *Baughman* decision explained, "section 821.6 frees investigative officers from the fear of

9 retaliation for errors they commit in the line of duty." *Id.* at 193 (citing *Amylou R.*, 28 Cal. App.

10 4th 1212–13).

11    In their reply brief, plaintiffs fail to provide any persuasive reasons why Section 821.6 does

12 not bar their trespass claim.  Given that plaintiffs' trespass claim appears to be barred under

13 Section 821.6, plaintiffs' motion for summary judgment on this claim is **DENIED**.  Since

14 defendants did not move for summary judgment on this claim, however, it remains for trial.

15    **C.    Plaintiffs' Negligence Claim**

16    Plaintiffs' negligence claim suffers from the same defects inherent in their trespass claim.

17 *First*, since this order has found that the 6 Winifred Court search warrant was facially valid, and

18 there are factual disputes surrounding the error committed by defendant Gardner, plaintiffs' have

19 not established that defendants acted in a negligent manner to warrant the granting of summary

20 judgment.  *Second*, because Section 821.6 immunizes negligent acts committed by public officials

21 within the scope of their employment while performing actions "incidental to the investigation of

22 crimes," it appears that plaintiffs' negligence claim may be barred by this section of the California

23 Government Code.  *See Blakenhorn*, 485 F.3d at 487–88; *see also Amylou R.*, 28 Cal. App. 4th at

24 1210 (listing cases where claims based upon negligence where barred by Section 821.6).

25    For these reasons, plaintiffs' motion for summary judgment on this claim is **DENIED**.  Since

26 defendants did not move for summary judgment on this claim, however, it remains for trial.

27

28    [13]  Defendants' request for judicial notice of the grand-jury indictment in Case No.
CR 08-00713, Docket No. 1, in the United States District Court for the Central District of
California, is **GRANTED**.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      Plaintiffs' California Bane Act Claim**

The California Bane Act provides a civil remedy for persons whose exercise of constitutional rights has been interfered with by "threats, intimidation or coercion."  Cal Civ. Code § 52.1; *see Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 841–43 (2004).  To obtain relief under the Act, a plaintiff need not prove that the defendant acted with discriminatory animus or intent.  Instead, a defendant may be found liable if he or she interfered with the plaintiff's constitutional rights by threats, intimidation, or coercion.  *Ibid.*

While plaintiffs seek summary judgment on this claim, they point to no competent evidence showing that any defendants interfered with their constitutional rights by "threats, intimidation, or coercion."  As such, summary judgment on this claim cannot be granted.  Even more potentially fatal to plaintiffs' California Bane Act claim, however, is the applicability of Section 821.6 immunity to claims brought under California Civil Code Section 52.1.  *See County of Los Angeles v. Superior Court*, 181 Cal. App. 4th 218, 231–32 (2009).  In *County of Los Angeles*, the court found that plaintiffs' California Bane Act claims based upon alleged injuries "resulting from defendants' search and seizure of property without probable cause and for improper reasons" involved exactly the type of conduct "which Government Code section 821.6 was designed to immunize."  *Ibid.*  Accordingly, the court "reject[ed] plaintiffs' contention that Civil Code section 52.1 prevails over the Government Code section 821.6 immunity."  *Id.* at 231.

The same rationale appears to bar plaintiffs' California Bane Act claim in the instant case. For these reasons, plaintiffs' motion for summary judgment on this claim is **DENIED**.  Since defendants did not move for summary judgment on this claim, however, it remains for trial.

**E.      County Liability Under *Respondeat Superior***

Given that plaintiffs' trespass, negligence, and California Bane Act claims may all be barred under Section 821.6, plaintiffs' motion for summary judgment against the County of Contra Costa must be **DENIED**.  *See* Cal. Gov. Code § 815.2(b) ("Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability.").  Since defendants did not move for summary judgment on the issue of *respondeat superior* liability, however, it remains for trial.

United States District Court

For the Northern District of California

**CONCLUSION**

For the reasons set forth herein, plaintiffs' motion for partial summary judgment that defendants Gardner and Moule are liable to plaintiffs under Section 1983 for violating the warrant requirement of the Fourth Amendment is **DENIED**.  Plaintiffs' motion targeting their trespass, negligence, and California Bane Act claims is also **DENIED**.  These state claims and whether defendant Gardner is entitled to qualified immunity remain for trial.  As for defendants, their motion for partial summary judgment that the 6 Winifred Court search warrant was facially valid is **GRANTED**.  Defendants' motion that all defendants other than defendant Gardner are protected by qualified immunity for violating the warrant requirement of the Fourth Amendment is also **GRANTED**.  Defendants' motion with respect to defendant Gardner, however, is **DENIED**.  Finally, as stated repeatedly herein, this order does not encompass or address plaintiffs' excessive force and "knock and announce" claims.  These claims also remain for trial.


**IT IS SO ORDERED.**


Dated:  September 3, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE